# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| GARY RUBLE,<br>    obo EIMER J. RUBLE, | ) ) ) | CASE NO:    5:10-cv-361 |
|     Plaintiff, | ) ) | MAGISTRATE JUDGE<br>NANCY A. VECCHIARELLI |
| v. | ) ) | |
| MICHAEL J. ASTRUE,<br>    Commissioner of Social Security, | ) ) ) | **MEMORANDUM OPINION** |
|     Defendant. | ) | **AND ORDER** |

Plaintiff, Gary Ruble, on behalf of the claimant, Eimer J. Ruble, challenges the

final decision of Defendant, Michael J. Astrue, Commissioner of Social Security (the

"Commissioner"), denying the claimant's applications for a Period of Disability ("POD"),

Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") under

Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, and 1381 *et seq.*

(The "Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is

before the undersigned United States Magistrate Judge pursuant to the consent of the

parties entered under the authority of 28 U.S.C. § 636(c)(2).  For the reasons set forth

below, the Court VACATES and REMANDS the final decision of the Commissioner.

1

## I.  PROCEDURAL HISTORY

On August 11, 2005, the claimant filed for DIB and SSI with an alleged disability onset date of September 30, 2000.  The claims were initially denied on December 22, 2005, and denied again upon reconsideration on June 8, 2006.  On May 8, 2008, the claimant had a hearing before an administrative law judge ("ALJ").  The claimant's counsel and a vocational expert ("VE") were present at the hearing.  On June 20, 2008, the ALJ found Plaintiff not disabled.  On January 25, 2010, the Appeals Council declined to review the ALJ's Decision.  The claimant timely filed this action in federal court.  (Doc. No. 1.)

On July 29, 2010, the claimant, by and through her counsel, filed a motion to substitute Gary Ruble, the claimant's father, as the plaintiff in this case because the claimant had passed away.  (Doc. No. 18.)  The Court granted the claimant's Motion. (Doc. No. 19.)

Plaintiff asserts four assignments of error:  (1) the ALJ failed to properly assess the claimant's allegations of the extent and severity of her fibromyalgia-related pain and fatigue; (2) the ALJ failed to properly consider the limitations assessed by the claimant's counselor at Portage Path Behavioral Heath; (3) the ALJ was not sufficiently clear about the weight he gave to a state agency consultative examiner's opinion of the claimant's functional capacity; and (4) the Commissioner failed to meet his burden of proving a significant number of jobs in the national economy that the claimant could perform based on her residual functional capacity ("RFC").  Therefore, Plaintiff seeks either remand or an immediate award of benefits.

2

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

The claimant was twenty years old on her alleged disability onset date (Tr. 22), and twenty-eight years old on the date of the ALJ's Decision  (Tr. 26).  She had a high school education and was able to communicate in English.  (Tr. 22.)  She did not have any past relevant work.  (Tr. 22.)

### B.    Medical Evidence

#### 1.    Physical Condition

The record indicates, and the ALJ found, that the claimant suffered fibromyalgia. On October 11, 2004, the claimant's treating physician, Dr. Joseph Burick, D.O., reported the results of an x-ray of the claimant's cervical spine.  (Tr. 233.)  Dr. Burick reported that the x-ray showed "No significant findings," except for some minor degenerative changes in two vertebrae.  (Tr. 233.)

Throughout 2004 and 2005, the claimant saw Dr. Burick with complaints including back spasms, fibromyalgia, abdominal pain, migraine headaches, and a swollen back.  (Tr. 212-31.)  On September 1, 2005, Dr. Burick noted that the claimant's medications were "working good."  (Tr. 212).

On November 30, 2005, Dr. John Robinson, D.O., evaluated the claimant at the request of the Bureau of Disability Determination.  (Tr. 244.)  The claimant complained of mid- to lower-back pain.  (Tr. 244.)  Dr. Robinson opined that the claimant could lift twenty pounds occasionally and ten pounds frequently; could stand or walk for less than two hours in an eight-hour workday; was not limited in her ability to sit for prolonged periods of time; could push and pull with her upper and lower extremities only to the

3

extent that her pain would allow; had no postural limitations; and had no manipulative, communicative, or environmental limitations.  (Tr. 246.)

On February 16, 2006, physical therapist V. Michael Krutel performed a functional capacity evaluation of the claimant upon referral from Dr. Burick and in relation to the claimant's pursuit of disability benefits.  (Tr. 294.)  Mr. Krutel observed that Plaintiff could lift only five pounds from the floor to waist-level repeatedly, and could lift a maximum of 10 pounds overhead.  (Tr. 295.)  Mr. Krutel further observed that the claimant performed the functional capacity evaluation with "marked difficulty," and determined that the claimant was "extremely limited."  (Tr. 295.)

Between August 7, 2006, and August 15, 2007, the claimant saw Dr. William Midian, M.D., at Barberton Citizen's Hospital Pain Management Office upon referral from Dr. Burick.  (Tr. 358-72.)  Dr. Midian diagnosed the claimant with diffuse myalgia/myositis.  (Tr. 368.)  Although neurological and spinal assessment showed negative results, Dr. Midian prescribed the claimant Lyrica.  (Tr. 358-59, 60, 61, 63, 64, 66, 69, 72.)  In July and August 2007, Dr. Midian reported that the claimant denied dysfunctional pain in her spine.  (Tr. 369, 371.)  However, Dr. Midian reported that the claimant still complained of pain in her knee and leg.  (Tr. 369.)

Between May 30, 2007, and February 14, 2008, the claimant saw Dr. Burick for a variety of complaints that included back pain.  (Tr. 387-94.)

On June 4, 2007, Plaintiff underwent a whole body bone scan.  (Tr. 386.) Testing showed mild irregularity along the cortices of the bilateral tibia, although the examiner indicated that it possibly was caused by Plaintiff's position on the testing table. (Tr. 386.)  Testing further showed mild irregularity involving the mid shaft of the left tibia.

4

(Tr. 386.)

On November 5, 2007, the claimant underwent an EMG examination of her legs. (Tr. 380-81.)  Testing showed both legs to be "normal," with no sign of radiculopathy or significant peripheral nerve abnormality.  (Tr. 380.)  Motor nerve conduction studies of the claimant's legs were also "normal," and showed no nerve entrapment or significant peripheral nerve abnormality.  (Tr. 381.)

### 2.    Mental Condition

Between September 21, 2004, and April 2, 2006, the claimant was treated at Portage Path Behavioral Health.  On October 4, 2004, Dr. Scott Schmitt, M.D. performed a psychiatric evaluation of the claimant at Portage Path.  (Tr. 189-92.)  The claimant reported that she had a history of fibromyalgia, that she suffered depression and anxiety since childhood, and that she received medications from her primary care provider but had very little counseling.  (Tr. 189-90.)  The claimant further reported that she started using alcohol and drugs before her teens, began using cocaine at age 16, and began using heroin at age 19, but that she had ended all drug and alcohol use by the time of her evaluation.  (Tr. 190.)  Dr. Schmitt diagnosed the claimant with recurrent, moderate major depressive disorder; an unspecified anxiety disorder; polysubstance dependence; fibromyalgia; migraine headaches; and chronic back pain.  (Tr. 191.)  Dr. Schmitt assigned the claimant a Global Assessment of Functioning ("GAF") score of 47.[1]  (Tr. 191.)  Dr. Schmitt recommended continuing the claimant on her current

---

[1] A GAF score between 41 and 50 indicates serious symptoms or a serious impairment in social, occupational, or school functioning.  A person who scores in this range may have suicidal ideation, severe obsessional rituals, no friends, and may be unable to keep a job.  *See Diagnostic and Statistical Manual of*

medications, which the claimant reported finding helpful.  (Tr. 191.)

On November 30, 2005, consultative psychologist E.M. Bard, Ph.D., performed a consultative psychological examination upon request from the Bureau of Disability Determination.  (Tr. 238.)  Dr. Bard indicated the following.  The claimant reported that the focus of her application was to receive benefits because of pain associated with her fibromyalgia and arthritis, although she also reported a history of depression.  (Tr. 238.) The claimant had normal intelligence and an estimated IQ of 105.  (Tr. 240.)  The claimant was fully oriented but performed poorly on memory test questions.  (Tr. 240.) A Wechsler Memory Scale III exam showed the claimant operated in the Low Average range of overall memory.  (Tr. 241.)  Tests also suggested severe depression and anxiety.  (Tr. 241.)  The claimant had mild limitations in relating to others; no limitations in her ability to understand, remember, and follow instruction; and no limitations in her ability to maintain attention, concentration, persistence, and pace to perform simple, repetitive tasks.  (Tr. 242.)  The claimant had mild to moderate limitations in her ability to withstand stress and pressure associated with daily work activity.  (Tr. 242.)

Dr. Bard diagnosed the claimant with an early onset of dysthymic disorder; polysubstance abuse in reported full, sustained remission; maladaptive health behaviors that affect the claimant's medical condition and obesity; and borderline personality features.  (Tr. 242.)  Dr. Bard assessed the claimant with a GAF score of 58.[2]  (Tr. 242.)

_Mental Disorders_ 34 (American Psychiatric Association, 4th ed. rev., 2000).

[2]  A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.  A person who scores in this range may have a flat affect, occasional panic attacks, few friends, or conflicts with peers and co-workers.  _See Diagnostic and Statistical Manual of_

6

On January 6, 2006, state agency psychologist Melanie Bergsten completed a psychiatric review technique form.  (Tr. 273.)  Ms. Bergsten found that the claimant had mild restrictions in her daily living activities and social functioning; moderate restrictions in her concentration, persistence, and pace; and no episodes of extended decompensation.  (Tr. 283.)  Ms. Bergsten further concluded that the claimant could perform simple- and multiple-step tasks in situations where duties were relatively static and changes could be explained.  (Tr. 289.)

On February 16, 2006, Portage Path counselor Blaine Muehlbauer completed a medical source mental assessment and indicated that the claimant would have "noticeable difficulty" performing the following areas of functioning:  understanding, remembering, or following short, simple instructions; maintaining attention and concentration for extended periods of time; maintaining regular attendance at work; being punctual within customary tolerances; completing a normal workday or workweek without interruptions from psychologically-based symptoms; performing at a consistent pace without an unreasonable number and length of rest periods; and responding appropriately to changes in routine work settings.  (Tr. 292-93.)  According to the Definitions of Rating Terms section on the assessment form, Mr. Muehlbauer's assessment meant that, although the claimant would be able to perform designated tasks or functions, she would suffer noticeable difficulty in performing them more than twenty percent of the workday or workweek.  (Tr. 292.)  Mr. Muehlbauer based his assessment on a clinical interview and a review of the claimant's chart.  (Tr. 293.)

_____

*Mental Disorders*, at 34.

7

On April 2, 2006, Mr. Muehlbauer completed a psychiatric evaluation of the claimant at the request of the Bureau of Disability Determination, which was signed by psychiatrist Heather Queen-Williams.  (Tr. 193-99.)  Mr. Muehlbauer indicated the following.  The claimant was fully oriented, had no thinking disorders, had fair concentration and short-term memory problems, had adequate abilities for abstract thinking, and had poor insight and judgment.  (Tr. 193.)  The claimant had been sober from drugs and alcohol for more than a year.  (Tr. 193.)  Her ability to remember, understand, and follow directions and maintain attention and concentration was "fair at best."  (Tr. 195.)  Her social interactions and adaptation were poor.  (Tr. 195.)  She "most likely would do poorly" in reacting to work pressures, but her mental condition "could be improved if she were to actively engage in individualized psychotherapy."  (Tr. 195.)  The claimant had a GAF score of 47.[3]

On May 12, 2006, state agency psychologist Roy Shapiro completed a psychiatric review technique form.  (Tr. 312-28.)  Mr. Shapiro indicated that the claimant had moderate restrictions in her daily living activities, social functioning, and concentration, persistence, or pace; and that the claimant had no episodes of decompensation.  (Tr. 322.)  Mr. Shapiro determined that the claimant could complete simple tasks in a low stress environment with limited contact with others.  (Tr. 328.)

Between December 2007 and June 2008, the claimant presented to Dr. Rakesh

_____

[3] A GAF score between 41 and 50 indicates serious symptoms or a serious impairment in social, occupational, or school functioning.  A person who scores in this range may have suicidal ideation, severe obsessional rituals, no friends, and may be unable to keep a job.  *See Diagnostic and Statistical Manual of Mental Disorders*, at 34.

Ranjan, M.D., for counseling regarding her depression and anxiety.  (Tr. 406-77.)
Medical sources at Dr. Ranjan's office assessed the claimant with a vast array of GAF
scores that ranged between 35[4] and 70.[5]  (Tr. 434, 444, 446, 459, 462, 466, 475.)

### C.    Hearing Testimony

#### 1.    The Claimant's Testimony

Plaintiff testified to the following.  She previously worked as a nurse's aide, a
retail stocker and pricer, a cook, a hostess, and a house cleaner.  (Tr. 30.)  She could
no longer work because of pain and fatigue that occurred suddenly many times during
the day.  (Tr. 30-31.)  The pain occurred all over her body, but particularly in her back,
legs, and feet.  (Tr. 31.)  She could walk for about five minutes before she needed to sit
down.  (Tr. 37.)  She lived by herself, but a friend from her substance abuse recovery
program helped her with her household chores.  (Tr. 34.)  She spent much of her day
laying in bed and drawing.  (Tr. 34.)

The claimant tried physical therapy to relieve her symptoms, which was
unsuccessful.  (Tr. 31.)  She heeded her doctor's advice to lose weight, however, and
had gone down one or two pants sizes.  (Tr. 31.)

---

[4] A GAF score between 31 and 40 indicates some impairment in reality testing or
communication or major impairment in several areas such as work or school,
family relations, judgment, thinking, or mood.  A person who scores in this
range may have illogical or irrelevant speech, and may avoid friends, neglect
family, and be unable to work.  *See Diagnostic and Statistical Manual of Mental
Disorders*, at 34.

[5] A GAF score between 61 and 70 indicates some mild symptoms or some
difficulty in social, occupational, or school functioning.  A person who scores in
this range may have a depressed mood, mild insomnia, or occasional truancy,
but is generally functioning pretty well and has some meaningful interpersonal
relationships.  *See Diagnostic and Statistical Manual of Mental Disorders*, at 34.

The claimant's depression was just as, if not more, debilitating than her physical problems.  (Tr. 32.)  She also suffered anxiety.  (Tr. 32.)  She had panic attacks about three times a month.  (Tr. 36.)  She had not used drugs or alcohol since September 20, 2004.  (Tr. 32.)

### 2.    The VE's Testimony

The ALJ posed the following hypothetical person to the VE:

> [A] younger individual with high school education.  No transferrable skills.
> Can perform the full range of sedentary work that is simple in a setting that
> does not impose high productive stress or frequent contact with the public.
> For example, no assembly line work, no retail sales, no fast food clerk.  With
> additional limitations that this person can lift five pounds frequently and ten
> pounds occasionally.  Can sit for one hour at a time for a total of six hours in
> an 8-hour day, but requires a sit/stand option every 15 minutes, meaning she
> needs to stand and stretch . . .  She can stand or walk for one hour at a time
> for a total of six hours in an 8-hour workday.  Cannot climb ladders or
> scaffolding.  Cannot work in heights or around dangerous machinery.

(Tr. 37-38.)  The ALJ then asked the VE, "Would there be any jobs in the national or regional economy that such a person could perform; and, if so, what numbers?"  (Tr. 38.)  The VE testified to the following jobs:  sedentary bench assembler, for which there were 400 positions in northeast Ohio and 70,000 nationally; wire worker, for which there were 500 positions in northeast Ohio and 70,000 nationally; and final assembler, for which there were 700 jobs in northeast Ohio and 100,000 nationally.  (Tr. 39.)

The VE noted that the jobs were consistent with the Dictionary of Occupational Titles ("DOT"), but that the employment figures were derived from the VE's personal experience combined with figures from the Department of Labor Bureau of the Census.  (Tr. 39.)  The ALJ then determined that the number of positions for the sedentary bench assembler job were not substantial.  (Tr. 40.)

10

On cross-examination, the claimant's counsel asked the VE whether a further limitation of being able to stand and walk less than two hours in an eight-hour day would affect the wire worker and final assembler jobs.  (Tr. 41.)  The VE testified that such a limitation could reduce the number of positions to an insignificant number, but that he could not say what the numbers might be reduced to.  (Tr. 41.)

The claimant's counsel then asked the VE whether a limitation of a sit-stand option at will rather than every fifteen minutes would affect the wire worker and final assembler jobs.  (Tr. 41.)  The VE testified that such a limitation would also "probably have an effect," but that he could not say to what extent.  (Tr. 41.)

Finally, the claimant's counsel asked the VE whether the wire worker and final assembler jobs would still be available if the hypothetical person were off task for fifteen percent of the time because of pain, depression, panic attacks, and overwhelming fatigue.  (Tr. 42.)  The VE answered that the jobs would not be available because being off task for fifteen percent of the time would be unacceptable to most employers.  (Tr. 42.)

### III.    STANDARD FOR DISABILITY

A claimant is entitled to receive benefits under the Social Security Act when she establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981).  A claimant is considered disabled when she cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 416.905(a).  To receive SSI benefits, a recipient

11

must also meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits.  20 C.F.R. §§ 404.1520(b) and 416.920(b).  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) and 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot,* 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience.  20 C.F.R. §§ 404.1520(d) and 416.920(d).  Fourth, if the claimant's impairment does not prevent her from doing her past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) and 416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), and 416.920(g).

## IV.  SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

12

1.     The claimant met the insured status requirements of the Social Security Act through June 30, 2002.

2.     The claimant has not engaged in substantial gainful activity since September 30, 2000, the alleged onset date.

3.     The claimant has the following severe impairments:  lumbar and cervical disorder, fibromyalgia, depression, personality disorder, and anxiety.

4.     The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments.

5.     After careful consideration of the entire record, the undersigned finds that the clamant has the [RFC] to perform sedentary work involving simple routine tasks and in a job setting that does not impose high production stress or frequent contact with the public.  She is able to lift five pounds frequently and 10 pounds occasionally.  She can sit for one hour at a time and for a total of six hours in an eight-hour workday but requires a sit/stand option every 15 minutes.  She is limited to standing/walking of one hour at a time and for a total of six hours in an eight-hour workday.  She cannot climb ladders, ropes, or scaffolding.  She cannot work around in heights or around dangerous machinery.

6.     The claimant has no past relevant work.

. . . . .

10.    Considering the claimant's age, education, work experience, and [RFC], there are jobs that exist in significant numbers in the national economy that the claimant can perform.

11.    The claimant has not been under a disability, as defined in the Social Security Act, from September 30, 2000, through the date of this decision.

## V.    LAW & ANALYSIS

### A.    Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether the Commissioner's decision is supported by substantial evidence, and whether it was

13

made pursuant to proper legal standards.  *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010).  Review must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ.  *Id.*  However, the court does not review the evidence *de novo*, make credibility determinations nor weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record.  *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Brainard*, 889 F.2d at 681.

**B.    The ALJ's Assessment of the Claimant's Subjective Statements of Fibromyalgia-Related Pain and Fatigue**

Plaintiff argues that the ALJ erred in his analysis of the claimant's subjective statements of disabling fibromyalgia-related pain and fatigue by focusing on the lack of corroborating, objective medical evidence rather than focusing on other relevant factors. For the reasons set forth below, the Court agrees.

Pain alone, if caused by a medical impairment, may be severe enough to constitute a disability.  *See Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 538 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983).  When determining whether a

14

claimant is disabled by pain, the ALJ must (1) consider whether the objective medical evidence supports a finding of an underlying medical condition, and (2) consider whether the objective medical evidence confirms the alleged severity of pain or whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.  *See Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986); *Felisky v. Bowen,* 35 F.3d 1027, 1038-39 (6th Cir. 1994); 20 C.F.R. § 404.1529(b), (c).  Here, the ALJ found that the claimant suffered fibromyalgia and that the claimant's fibromyalgia was a severe impairment; therefore, the first prong of the pain analysis is met.

Regarding the second prong, difficulty arises when evaluating whether objective medical evidence corroborates allegations of pain caused by fibromyalgia.  Those who suffer fibromyalgia present no objectively alarming signs.  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 243, 243 (6th Cir. 2007); *see also Preston v. Sec'y of Health & Human Servs.*, 854 F.2d 815, 820 (6th Cir.1988) (per curiam) (noting that objective tests are "of little aid or relevance" in determining the existence or severity of fibromyalgia).  In other words, objective medical evidence corroborating allegations of pain derived from fibromyalgia is often nonexistent.

However, objective medical evidence is not dispositive in assessing allegations of pain.  An adjudicator is required to consider factors other than objective medical evidence that may or may not corroborate a claimant's allegations of pain.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997); *Felisky*, 35 F.3d at 1039; 20 C.F.R. § 404.1529(c)(2).  In light of the inherent absence of objective medical evidence in cases of fibromyalgia, evaluation of such other factors is crucial and must be given

15

significant attention.  Such other factors include statements from the claimant and the claimant's treating and examining physicians; diagnosis; efforts to work; the claimant's daily activities; the location, duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication taken to alleviate the symptoms; treatment, other than medication, the claimant receives to relieve pain; measures used by the claimant to relieve symptoms; and any other factors concerning functional limitations due to symptoms. *See Felisky*, 35 F.3d at 1039-40; 20 C.F.R. §§ 404.1529(a), (c)(3), 416.929(a), (c)(3); S.S. R. 96-7p, 1996 WL 374186, at *3.  Moreover, an ALJ's decision must contain specific reasons for the ALJ's finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the claimant and to any subsequent reviewers the weight the adjudicator gave to the claimant's statements and the reasons for that weight.  S.S.R. 96-7p, 1996 WL 374186, at *2.

Here, the ALJ did not adequately explain, and it is therefore not clear, how the foregoing factors lent to the conclusion that the claimant's subjective statements of fibromyalgia-related pain and fatigue were not credible.  Therefore, as explained below, remand is necessary.

The ALJ noted the claimant's allegations:  that she could not work because of pain and fatigue that occurred suddenly many times during the day;  that the pain occurred all over her body, but particularly in her back,  legs, and feet; that she could walk for about five minutes before she needed to sit down; that she lived by herself, but a friend from her substance abuse recovery program helped her with her household chores; and that, in sum, she spent much of her day laying in bed and drawing.  (Tr. 18,

16

20.)  The ALJ concluded that "the claimant greatly minimized her daily activities," and that "the record does not support such decreased activities."  (Tr. 20.)  However, the ALJ did not explain the basis for his conclusion that the claimant was "minimizing" her daily activities, and did not explain how the record did not support the claimant's reported daily activities.  The ALJ largely cited the lack of objective medical findings as the basis for concluding that the claimant lacked credibility.  (Tr. 18-19.)  Objective medical findings, however, are not reliable for determining the severity of fibromyalgia-related pain.  *Preston*, 854 F.2d at 820.

The evidence other than objective medical findings, to which the ALJ cited to conclude that the claimant's allegations were not credible, was a progress note from an unspecified medical source that indicated the claimant's medications were working well, and the claimant's statement to Dr. Midian that her back did not hurt.  (Tr. 18.)  However, the ALJ did not explain how this evidence was more credible than the rest of the record evidence, which included persistent complaints of back and other pain notwithstanding the claimant's medications.

The ALJ noted the claimant's allegation that any type of activity precipitated or aggravated her pain, but dismissed the allegation by citing objective medical testing that did not corroborate the existence of such pain.  (Tr. 18.)  Again, objective medical findings are not reliable for determining the severity of fibromyalgia-related pain, *Preston*, 854 F.2d at 820, and the ALJ did not provide another clear basis for rejecting the claimant's alleged precipitating or aggravating factors.

Furthermore, although the ALJ noted the claimant's allegation that her treatments were largely unsuccessful, he dismissed the allegation by explaining that the claimant

17

had lost weight, and that the claimant's medical care had been mostly conservative as the claimant did not undergo surgery.  (Tr. 19.)  It is not at all clear how the facts that the claimant lost weight and did not undergo surgery weighed against her allegations that she continued to suffer disabling fibromyalgia-related pain and fatigue and that her treatments were not alleviating her symptoms.

Although the Court does not entirely agree with the claimant's characterization of her symptoms and the extent that they limited her, the Court finds that the ALJ's analysis does not clearly set forth the reasons for giving the claimant's allegations of fibromyalgia-related pain and fatigue little weight.  In cases of fibromyalgia, the factors other than objective medical evidence are virtually the only means to corroborate allegations of pain.  In light of the ALJ's finding that the claimant suffered severe fibromyalgia, the claimant's allegations of disabling pain and fatigue, the ALJ's cursory dismissal of the claimant's reported daily activities, and the absence of a more thorough discussion of factors other than objective medical evidence, this Court concludes that a remand is necessary.

On remand, the ALJ should reevaluate the claimant's subjective complaints of fibromyalgia-related limitations and provide a more detailed and specific analysis of the factors other than objective medical evidence and how they relate to the evidence in this case.  The ALJ should make any necessary reassessment of the claimant's RFC, which may require a new hypothetical question to the VE.

**C.    The ALJ's Assessment of the Claimant's Portage Path Behavioral Health Counselor's Opinions**

Plaintiff argues that the ALJ failed to fully consider Mr. Blaine Muehlbauer's

opinions of the claimant's limitations, and failed to make clear why he gave Mr. Muehlbauer's opinions the weight he gave them, pursuant to Social Security Ruling 06-03p.  The Court agrees that the quality of the ALJ's discussion of Mr. Muehlbauer's opinions supports the conclusion that remand is necessary.

Although the ALJ described Mr. Muehlbauer as a state agency reviewing psychologist, Mr. Muehlbauer is actually a counselor who worked at Portage Path and evaluated the claimant on several occasions.  Counselors are "Non-medical Sources"; however, information from such sources may provide insight into the severity of a claimant's impairments and how the severity of the impairments affects the claimant's ability to function.  S.S.R. 06-03p, 2006 WL 2329939, at *2.  An adjudicator generally should explain the weight given to opinions from such other sources or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an impact on the outcome of the case.  Id. at *6.

Mr. Muehlbauer indicated that the claimant suffered noticeable difficulty in several areas of functioning, including maintaining full attention and concentration for extended periods of time, maintaining regular attendance, being punctual, completing a normal work day, and performing at a consistent pace without an unreasonable number and length of rest periods.  This noticeable difficulty would occur twenty percent of the workday or workweek.  The ALJ noted Mr. Muehlbauer's assessment of the claimant's limitations and afforded them "significant weight" because they were "well supported by the evidence of record."  (Tr. 21.)  The ALJ did not explain, however, and the Decision is not clear, how Mr. Muehlbauer's assessment is inconsistent with disability.  Indeed,

the VE testified that a person with the claimant's limitations who was off task for fifteen percent of the workday or workweek would not be able to perform any of the jobs to which the VE testified.  In light of the VE's testimony, it would appear that Mr. Muehlbauer's assessment is consistent with disability and, therefore, may have an impact on the outcome of the case.  On remand, the ALJ should more clearly reconcile Mr. Muehlbauer's assessment with the rest of the record evidence and the VE's testimony.

### D.  The ALJ's Assessment of the State Agency Consultative Examiner's Opinions

Plaintiff argues that the ALJ's discussion of state agency consultative examiner Dr. John Robinson's assessment of the claimant's RFC was not sufficiently clear pursuant to Social Security Ruling 96-6p, and Code of Federal Regulations sections 404.1527 and 416.927.  Plaintiff's argument, however, lacks merit.  Even though the Social Security Rulings and Code of Federal Regulations require a certain degree of clarity in a determination or decision, courts will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.  *Connor v. U.S. Civil Serv. Comm'n*, 721 F.2d 1054, 1056 (6th Cir. 1983); *see also Am. Farm Lines v. Black Ball Freight Serv.*, 397 U.S. 532, 539 (1970) (holding that agency's failure to follow its own regulations did not require reversal absent a showing of substantial prejudice by the affected party).  Here, Dr. Robinson opined that Plaintiff was capable of light work.  The ALJ, however, determined that the claimant was capable of sedentary work.  The ALJ's finding was favorable to the claimant, and Plaintiff does not explain how the claimant

20

was thereby prejudiced or deprived of a substantial right.  Therefore, this assignment of error lacks merit.

> ### E.    The Commissioner's Burden of Proving a Significant Number of Jobs in the National Economy

Plaintiff argues that, even assuming the ALJ's RFC assessment were an accurate portrayal of the claimant's limitations, the Commissioner failed to meet his burden of proving a significant number of jobs in the national economy that the claimant could perform because the jobs to which the VE testified were not consistent with the claimant's mental impairments, physical restrictions, and limited means, and because there was a "lack of any studies within [the] record documenting the numbers of wire worker and final assembler jobs identified by the VE."  (Pl.'s Br. 18-19.)  For the following reasons, this assignment of error lacks merit.

Plaintiff does not cite any legal authority setting forth a legal standard requiring the case record to contain "studies" supporting the VE's testimony regarding the number of jobs in the national economy, and the Court is unaware of such a requirement.  Indeed, although a finding of a significant number of jobs in the national economy must be supported by substantial evidence, substantial evidence may be established by a VE's testimony that is based on an accurate portrayal of the claimant's physical and mental limitations.  *Workman v. Comm'r of Soc. Sec.*, 105 F. App'x 794, 799 (6th Cir. 2004) (quoting *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987)).

Plaintiff otherwise appears to argue that substantial evidence does not support the number of jobs to which the VE testified the claimant could perform.  Plaintiff does

21

not, however, explain how the ALJ's RFC does not support the jobs to which the VE

testified.  Therefore, the Court need not entertain this argument.  *See McPherson v.*

*Kelsey*, 125 F.3d 989, 995-96 (6th Cir.1997) ("[I]ssues adverted to in a perfunctory

manner, unaccompanied by some effort at developed argumentation, are deemed

waived.  It is not sufficient for a party to mention a possible argument in the most

skeletal way, leaving the court to put flesh on its bones."); *Meridia Prods. Liab. Litig. v.*

*Abbott Labs.*, 447 F.3d 861, 868 (6th Cir. 2006).

## VI.    CONCLUSION

For the foregoing reasons, the decision of the Commissioner is VACATED and

REMANDED.

**IT IS SO ORDERED.**

s/ *Nancy A. Vecchiarelli*
Nancy A. Vecchiarelli
U.S. Magistrate Judge

Date:  December 13, 2010